295 F.3d 390
 Evelyn BALSAVAGE, widow of Anthony Balsavage, Claimant/Petitioner,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS (United States Department of Labor), Party-in-Interest/Respondent.
 No. 01-2091.
 United States Court of Appeals, Third Circuit.
 Filed June 28, 2002.
 Argued: January 15, 2002.
 
 COPYRIGHT MATERIAL OMITTED Helen M. Koschoff (argued), Warburton, PA, for claimant/petitioner Evelyn Balsavage, widow of Anthony Balsavage.
 Jeffrey S. Goldberg (argued), Howard M. Radzely, Acting Solicitor of Labor, Donald S. Shire, Associate Solicitor, Patricia M. Nece, Counsel for Appellate Litigation, U.S. Department of Labor, Office of the Solicitor, Washington, DC, for party-in-interest/respondent Director, Office of Workers' Compensation Programs, (United States Department of Labor).
 Before: ALITO, ROTH, Circuit Judges, and SCHWARZER,* Senior District Judge
 OPINION OF THE COURT
 SCHWARZER, Senior Judge.
 
 
 1
 Evelyn Balsavage petitions for review of a final order of the Benefits Review Board, United States Department of Labor, affirming a final decision of the Administrative Law Judge ("ALJ") denying survivor's benefits to appellant, pursuant to 33 U.S.C. § 921(b)(3), as incorporated into the Black Lung Benefits Act, 30 U.S.C. §§ 901-945. Mrs. Balsavage is the widow of Anthony Balsavage ("the Miner"), who died at the age of 73 on November 10, 1998. We must decide whether the ALJ's decision is supported by substantial evidence. We have jurisdiction under 33 U.S.C. § 921(c), as incorporated by 30 U.S.C. § 932(a), and grant the petition.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 In 1991, Dr. Edward W. Cubler diagnosed the Miner with pneumoconiosis[1] Category II, severe obstructive lung disease, moderately severe emphysema, low blood oxygen levels at rest, and severe wheezes and rales over all lung fields. The Miner could "walk about 50 yards before [getting] winded" and could "not make a flight of stairs because of his shortness of breath." Dr. Cubler concluded that the Miner had a "severe impairment... preventing him from performing his last coal mine job," and certified him totally disabled. Later that year, Dr. Richard F. Feudale, who treated the Miner from 1963 to 1991, examined him and diagnosed pneumoconiosis, severe obstructive lung disease, bilateral pulmonary emphysema, and other respiratory symptoms. Neither physician noted any cardiac dysfunction.
 
 
 3
 Seven years later, on September 24, 1998, the Miner was admitted to Ashland Regional Medical Center, suffering from "shortness of breath and syncope" and other cardiac and respiratory symptoms. The principal diagnosis, by attending physician Dr. Houssam Abdul-Al, was "acute congestive heart failure"; other diagnoses were "new onset atrial fibrillation; chronic obstructive pulmonary disease; coronary artery disease; emphysema; pleural effusion; [and] mitral insufficiency." Chest x-rays showed "moderate left ventricular enlargement increased from previous study with recent changes indicating mild congestive heart failure superimposed on chronic obstructive pulmonary disease." EKGs revealed "atrial fibrillation with rapid ventricular response, left axis deviation, [and] left bundle branch block." He was discharged in stable condition on September 28.
 
 
 4
 On November 10, 1998, the Miner suffered a "cardio-pulmonary arrest" after "coughing and gagging prior to arrest," according to the emergency care registration form. He died within minutes of admission to the hospital.[2]
 
 
 5
 Three physicians made written submissions in support of Mrs. Balsavage's claim, two of them treating physicians, and one also testified on deposition. All concluded that pneumoconiosis hastened or contributed to the Miner's death.
 
 
 6
 Dr. Raymond J. Kraynak served as the Miner's treating physician for roughly sixteen months, seeing him every one to two months until about six weeks before his death.[3] On January 11, 1999, Dr. Kraynak wrote a one-page letter to the Department of Labor stating, "I do not have any records concerning the circumstances of his death and [am] unable to give you an updated report." Six months later, on July 27, 1999, Dr. Kraynak wrote to Mrs. Balsavage's attorney stating, "[i]t is clear from my taking care of Mr. Balsavage and from his complaints for some time, that coal workers' pneumoconiosis was a substantial and causative factor in [his] death." In deposition testimony on October 8, 1999, Dr. Kraynak testified that, after having reviewed the Miner's medical records, in his opinion the Miner's death was "due to acute respiratory arrest as well as anthracosilicosis which caused the arrest." He added that the Miner "had some cardiac difficulties due to his anthracosilicosis." On cross-examination, during which he was asked whether pneumoconiosis could have caused the Miner's coronary artery disease or atrial fibrillation, he explained that it could be indirectly responsible by requiring "the heart ... to pump blood through a diseased lung," lowering blood oxygen and "aggravat[ing] the conductive mechanism of the heart." Two weeks later, on October 15, 1999, Dr. Kraynak wrote to Mrs. Balsavage's attorney in response to the opinion letter Dr. Samuel V. Spagnolo gave the Director, stating:
 
 
 7
 From my review of all the records, my personal care of Mr. Balsavage during his lifetime, as well as interviewing the widow in this matter, it is still my opinion that Mr. Balsavage's death was due to coal workers' pneumoconiosis, contracted during his employment in the anthracite coal industry.... He definitely would have survived longer if he did not have coal workers pneumonoconiosis.
 
 
 8
 On August 18, 1999, Dr. Abdul-Al, who had treated the Miner from September 24 until his death seven weeks later, reported that he "saw [the Miner] at the hospital... when he had cardiopulmonary arrest and had unsuccessful resuscitation [i.e. death]." He concluded that he had "diffuse fibrotic pulmonary disease due to anthrasilicosis and pneumoconiosis and because of his condition his heart was getting progressively worse.... I do believe that the number one cause of his death is the anthrasilicosis which was the reason he developed cardiac disease."
 
 
 9
 On September 29, 1999, Dr. John P. Simelaro, after reviewing twenty documents from the Miner's medical records,[4] opined that the Miner's "anthracosilicosis" caused fibrosis in his lungs, interfering with oxygen uptake to the myocardium, which led to "cardiac dysfunction [as evidenced by his] dysrhythmia [and] atrial fibrillation." This, in turn, caused "a 20% reduction in cardiac output." He concluded there was diffuse airway destruction from the anthracosilicosis, increasing "overall cardiopulmonary compromise," "leading to cardiac failure and eventually death ... in this case."
 
 
 10
 In opposition to Mrs. Balsavage's case, the Director offered the medical report of Dr. Spagnolo, dated September 25, 1999, which was based on a review of documents from the Miner's medical records.[5] Dr. Spagnolo's letter states that
 
 
 11
 [his] chronic left heart disease had worsened just prior to his cardiac arrest and evidence of left heart failure was present. He [sic] heart disease was unrelated to his pneumoconiosis and emphysema. Increasing respiratory symptoms prior to his death were the result of left heart failure. His terminal event was cardiac arrest caused by his acute and chronic coronary artery disease.... [T]he medical records do not provide objective, reliable or reproducible evidence that pneumoconiosis contributed in any way to [the Miner's] death. He would have died at the same time even if he had no other underlying medical conditions including pneumoconiosis.
 
 
 12
 The ALJ rejected the Miner's three physicians' proffered evidence and instead accepted Dr. Spagnolo's opinion that the Miner's death was precipitated by left heart disease and not hastened by pneumoconiosis. He found that the three physicians' testimony did not persuasively establish that the Miner's pneumoconiosis even hastened the Miner's death.
 
 SCOPE OF REVIEW
 
 13
 We review the Board's decision to determine whether the Board adhered to its statutory scope of review. Kertesz v. Crescent Hills Coal Co., 788 F.2d 158, 162 (3d Cir.1986). The Board was required to accept the ALJ's findings of fact if supported by substantial evidence. 33 U.S.C. § 921(b)(3), as incorporated by 30 U.S.C. § 932(a). Thus, we must "`independently review the record and decide whether the ALJ's findings are supported by substantial evidence.'" Lango v. Director, OWCP, 104 F.3d 573, 576 (3d Cir.1997) (quoting Kowalchick v. Director, OWCP, 893 F.2d 615, 619 (3d Cir.1990)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). If substantial evidence exists, we must affirm the ALJ's interpretation of the evidence even if we "might have interpreted the evidence differently in the first instance." Old Ben Coal Co. v. Battram, 7 F.3d 1273, 1278 (7th Cir.1993).
 
 DISCUSSION
 
 14
 To be entitled to benefits, Mrs. Balsavage must prove that "[t]he miner's death was due to pneumoconiosis." 20 C.F.R. § 718.205(a)(3). "[D]eath will be considered to be due to pneumoconiosis... [w]here pneumoconiosis was a substantially contributing cause or factor leading to the miner's death or where the death was caused by complications of pneumoconiosis." 20 C.F.R. § 718.205(c)(2). Pneumoconiosis is a "substantially contributing cause of a miner's death `if it hastens the miner's death.'" 20 C.F.R. § 718.205(c)(5). "Even if pneumoconiosis hastened by only a few days a miner's death from other causes, there is a basis to award benefits." Lango, 104 F.3d at 576.
 
 
 15
 The ALJ has broad discretion to determine the weight accorded each doctor's opinion. Director, OWCP v. Mangifest, 826 F.2d 1318, 1326 (3d Cir.1987). "ALJ is not bound to accept the opinion or theory of any medical expert, but may weigh the medical evidence and draw its own inferences." Mancia, 130 F.3d at 588. However, as the ALJ recognized, "the opinion of a miner's treating physician play[s] a major role in the determination of eligibility for black lung benefits.'" Id. at 590-91 (quoting Schaaf v. Matthews, 574 F.2d 157, 160 (3d Cir.1978)); but see Lango, 104 F.3d at 577 (noting that there is some question about the extent of reliance to be given a treating physician's opinion where there is conflicting evidence).
 
 
 16
 The Miner's treating physicians' testimony established without qualification that in their opinion his pneumoconiosis hastened or contributed to his death. The ALJ rejected Dr. Kraynak's entire opinion simply because of his testimony on cross-examination that pneumoconiosis "could" cause coronary artery disease and atrial fibrillation.[6] The ALJ found this testimony "somewhat qualified," concluding, "[t]his is a factor which detracts from the probative weight I will accord Dr. Kraynak's conclusions." But Dr. Kraynak's statements must be viewed in context — both as responses on cross-examination to general questions and against the backdrop of his repeated assertions that pneumoconiosis contributed to the Miner's death. They do not "qualify" his previously expressed and his subsequently reiterated opinion. They are at most peripheral, and it was error for the ALJ to reject that opinion on that basis. Cf. Mancia, 130 F.3d at 589 (finding error in ALJ's rejection of a treating physician's medical opinion as merely an "assumption").
 
 
 17
 The ALJ also rejected Dr. Abdul-Al's opinion because "it is not clear that [he] examined the Miner on his last day while [he was] alive." It is clear, however, from Dr. Abdul-Al's report that he saw the Miner in the hospital "when he had cardiopulmonary arrest and had unsuccessful resuscitation," at or about the time of his death. That he may not have examined him on his last day does not warrant rejection of his opinion as a treating physician during the seven weeks of the Miner's terminal illness.
 
 
 18
 Finally, the ALJ rejected the opinions of Dr. Simelaro, a consulting physician, because they "do not persuasively focus on the cardiac factors." The import of this statement is obscure. As noted above, Dr. Simelaro's report focuses specifically on how anthracosilicosis caused fibrosis in the Miner's lungs leading to "cardiac dysfunction as is noted by his dysrhythmia, atrial fibrillation." His report was based on review of the Miner's full medical file. He reiterated his opinion that the Miner's death was due to heart failure as a result of lung failure due to pneumoconiosis after reviewing Dr. Spagnolo's opinion.
 
 
 19
 Physicians' reasoning, consideration of records, and credentials are relevant to an ALJ's determination. Sterling Smokeless Coal Co. v. Akers, 131 F.3d 438, 441 (4th Cir.1997). "The ALJ may disregard a medical opinion that does not adequately explain the basis for its conclusion." Lango, 104 F.3d at 578 (internal quotations and citations omitted). In addition, he "should reject as insufficiently reasoned any medical opinion that reaches a conclusion contrary to objective clinical evidence without explanation." Kertesz, 788 F.2d at 163; cf. Mancia, 130 F.3d at 589 (ALJ could not reject a reasoned assessment as an assumption).
 
 
 20
 Here, the ALJ did not reject these physicians' opinions as inadequately explained, insufficiently reasoned, or contrary to clinical evidence. Rather, he simply failed to address them. His rejection of this evidence was based on peripheral quibbles at best and is not supported by substantial evidence. See Mancia, 130 F.3d at 593 ("The ALJ was not free to selectively credit testimony merely because it supports a particular conclusion while ignoring all evidence contrary to that conclusion.").
 
 
 21
 The ALJ instead deferred to Dr. Spagnolo's conclusions partly on the basis of his strong credentials. That Dr. Spagnolo's credentials may be more distinguished than those of Mrs. Balsavage's physicians, however, does little to resolve the question whether substantial evidence supports the ALJ's conclusion.
 
 
 22
 The ALJ stated that he was "more persuaded... by Dr. Spagnolo's analysis ... to explain that the miner's death was caused ... by cardiac arrest caused by his acute and chronic coronary artery disease.... [His] report appears more comprehensively to address the cardiac factors" that led to the Miner's death. The issue in this case, however, is not whether the coronary heart disease from which the Miner suffered caused his death but, rather, whether his pneumoconiosis (which is not disputed) contributed to or hastened his death, if "by only a few days." Lango, 104 F.3d at 576. Dr. Spagnolo states that "[t]hese medical records do not provide objective, reliable or reproducible evidence that pneumoconiosis contributed in any way to Mr. Balsavage's death." But in reaching that conclusion, Dr. Spagnolo did not consider the reports of the three physicians who opined that pneumoconiosis was a contributing cause of death, and he did not address the reasoning on which those opinions were based. Nor did the ALJ in reaching his conclusion discuss the evidence on this central issue. Thus, the ALJ's decision rejecting Mrs. Balsavage's claim is not supported by substantial evidence.
 
 CONCLUSION
 
 23
 Because the ALJ's decision failed to consider and address Mrs. Balsavage's evidence on the central issue whether pneumoconiosis contributed to or hastened the Miner's death, it is not supported by substantial evidence. We therefore GRANT the petition and REVERSE the Board's order. But because we cannot say that the record cannot support conflicting inferences and supports only one conclusion, we REMAND for the ALJ to make findings of fact. See Kowalchick v. Director, OWCP, 893 F.2d 615, 624 (3rd Cir.1990).
 
 
 
 Notes:
 
 
 *
 The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 Pneumoconiosis, also known as black lung disease or anthracosis, is a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment. "Pneumoconiosis" includes both clinical and legal pneumoconiosis, which include, but are not limited to "anthracosilicosis, anthracosis, anthrosilicosis..., [and] any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment." 20 C.F.R. § 718.201(a)(1)-(2);see also The Merck Manual 622 (17th ed. 1999) (defining the disease as a nodular deposition of dust in the lungs as a result of long-term exposure to bituminous or anthracitic coal dust in coal mining).
 The Director does not contest the existence of pneumoconiosis.
 
 
 [2]
 The death certificate listed as immediate causes acute respiratory arrest, chronic obstructive pulmonary disease, and anthrasilicosis. It was signed by a registered nurse and deputy coroner, not a physician or the person holding the office of coroner. There was no autopsy, x-ray, biopsy evidence, or other contemporaneous medical examination. Under these circumstances, the death certificate has no probative valueSee Lango v. Director, OWCP, 104 F.3d 573, 578 (3d Cir.1997); cf. Mancia v. Director, OWCP, 130 F.3d 579, 587 (3d Cir.1997).
 
 
 [3]
 Dr. Kraynak had replaced Dr. Feudale, who had treated the Miner for the preceding twenty-eight years
 
 
 [4]
 These documents included (a) Dr. Cubler's report of February 11, 1991; (b) the accompanying pulmonary function study; (c) the accompanying blood gas study; (d) the accompanying chest x-ray readings; (e) the July 23, 1991, pulmonary function study; (f) Dr. Feudale's August 27, 1991, report; (g) the Ashland Regional Medical Center records; (h) the death certificate; (i) Dr. Kraynak's January 11, 1999, report; (j) Dr. Kraynak's July 27, 1999, report; (k) Dr. Abdul-Al's medical records; (l) Dr. Abdul-Al's August 18, 1999, report; and several administrative filings and documents.
 
 
 [5]
 These eleven documents included items (a)-(i), listed in the preceding footnote, but excluded items (j), (k), and (l) as well as Dr. Simelaro's report.
 
 
 [6]
 Specifically, Dr. Kraynak was asked whether coronary artery disease "would not be due to lowered blood oxygen from pneumoconiosis." He implied that the question contained a sophistry, explaining, "It wouldn't be due to lowered oxygen. Coronary artery disease could be precipitated by the heart having to pump blood through a diseased lung. It's more stressful on the heart." Similarly, when asked, "And that [atrial fibrillation] would not be caused by pneumoconiosis, would it?" the doctor replied, "No, not directly. Indirectly again the heart has to strain itself to pump blood through a diseased lung and then we have lowered blood oxygen. That could give rise and aggravate the conductive mechanism of the heart giving rise to atrial fibrillation."
 
 
 
 24
 ROTH, Circuit Judge, dissenting.
 
 
 25
 I respectfully dissent. The ALJ, when confronted with conflicting medical opinions, chose to follow that of Dr. Samuel V. Spagnolo, the physician who, the ALJ found, gave the more thorough and well documented analysis and who had the superior credentials. Dr. Spagnolo determined that the Miner's heart disease was unrelated to his pneumoconiosis and that pneumoconiosis did not contribute in any way to the Miner's death. When there is a conflict in medical opinions, it is entirely appropriate for the ALJ to choose to follow the opinion of the physician with the more thorough analysis and the superior credentials. See, e.g., Sterling Smokeless Coal Co. v. Akers, 131 F.3d 438, 441 (4th Cir.1997); Peabody Coal Co. v. Helms, 901 F.2d 571, 573 (7th Cir.1990).
 
 
 26
 The majority faults Dr. Spagnolo for not considering the reports of the three other physicians who opined that pneumoconiosis did contribute to the Miner's death. Medical diagnosis and opinions as to medical causation are, however, based on the objective facts, observations, and test results entered in the medical records. A physician is well justified in basing a medical opinion on the objective facts of the medical records and not on an explanation of the deficiencies of the opinions of other, less qualified physicians. Dr. Spagnolo thoroughly reviewed all the pertinent medical records. For that reason, I find no weakness in Dr. Spagnolo's opinion based on the fact that he does not attempt to explain away the opinions of his less qualified colleagues.