

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-9-2009

# Hill v. Director OWCP

Precedential or Non-Precedential: Precedential

Docket No. 06-4868

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Hill v. Director OWCP" (2009). *2009 Decisions.* Paper 1446.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1446

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-4868
_____

PEGGY HILL, Widow of Charles W. Hill,
                                        *Petitioner*,


v.


DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES DEPARTMENT OF
LABOR,
                                        *Respondent*.


On Petition for Review of an Order of
the Benefits Review Board
United States Department of Labor
(BRB No. 06-0266 BLA)

Argued March 24, 2008

Before: McKEE, RENDELL, & TASHIMA[*] <u>Circuit Judges</u>

---

[*] Honorable A. Wallace Tashima, Senior Judge of the
United States Court of Appeals for the Ninth Circuit, sitting by
designation.

(Opinion Filed: April 9, 2009)

_____

George E. Mehalchick **(ARGUED**)
Lenahan & Dempsey, P.C.
The Kane Building
116 North Washington Avenue, Suite 400
Scranton, PA 18503

*Counsel for Petitioner*

Jonathan L. Snare
Allen H. Feldman
Patricia M. Nece
Kristen Lindberg **(ARGUED)**
United States Department of Labor
Office of the Solicitor
Suite N-2117
200 Constitution Avenue NW
Washington, D.C.  20210

*Counsels for Respondent*

_____

OPINION

_____

2

McKEE, <u>Circuit Judge</u>

The widow of a deceased coal miner petitions for review of a decision of the Benefits Review Board affirming an Administrative Law Judge's denial of her claim for survivor's benefits under the Black Lung Benefits Act, 30 U.S.C. §§ 901-945. For the reasons that follow, we will grant the petition for review, and remand for payment of her claim.

## I. FACTS AND PROCEDURAL BACKGROUND

Charles Hill worked in coal mines in Northeastern Pennsylvania for more than twenty years. During his employment, he was responsible for physically breaking up coal with a pick and shovel and loading it into mine cars and shaker chutes. Hill was also involved in mine drilling, tamping explosives and blasting operations.

Hill first applied for Black Lung benefits on April 18, 1980. The Department of Labor administratively denied the

3

claim and thereafter denied two additional claims that Hill filed in June of 1984 and September of 1991. Hill applied for benefits a fourth time on November 3, 1993 and was denied once again. That denial was affirmed after a formal hearing, but the Benefits Review Board reversed the ALJ's decision denying benefits. On remand, the ALJ finally awarded benefits dating back to November 1993, and augmented the benefits to include Hill's wife and son who were listed as dependents. In awarding benefits the ALJ concluded that: (1) the record sufficiently established the existence of pneumoconiosis, (2) a causal relationship existed between the pneumoconiosis and 9 ½ years of documented coal mine employment, and (3) Hill suffered total disability due to pneumoconiosis.

Hill died on August 7, 2004, and his widow, Peggy Hill, timely filed for survivor's benefits under the Black Lung Benefits Act. That claim was denied by the Department of

4

Labor on February 15, 2005, but Mrs. Hill appealed and received a hearing before an ALJ.

At the hearing before the ALJ, the parties stipulated that Hill had contracted pneumoconiosis from working in the mines based on his receipt of Black Lung benefits during his lifetime. Accordingly, the only issue facing the ALJ was whether Hill's death had been caused by pneumoconiosis as required for survivor's benefits under 20 C.F.R. § 718.250(c). The ALJ heard testimony from Mrs. Hill and received the deposition of Dr. Kevin Carey. Dr. Carey had treated Charles Hill at Wilkes-Barre General Hospital and at Lakeside Nursing Home, where Mr. Hill had died just a few days after being transferred there from Wilkes-Barre General.

The ALJ denied Hill's claim, and that denial was affirmed by the Benefits Review Board. The Board concluded that Dr. Carey had not made a finding of clinical

5

pneumoconiosis and "did not state that his finding of chronic obstructive pulmonary disease/chronic lung disease is related to coal mine employment (legal pneumoconiosis)." BRB Decision at 5. Thus, the Board agreed with the ALJ's conclusion that the evidence was insufficient to establish death due to pneumoconiosis.

This petition for review followed.

## II. THE EVIDENCE BEFORE THE ALJ

During her testimony before the ALJ, Mrs. Hill confirmed that her husband had been experiencing shortness of breath and could not go up a flight of stairs without taking a break. She also testified that Mr. Hill had a severe, productive cough and that he had difficulty sleeping because of his labored breathing. Mrs. Hill confirmed that Mr. Hill had these symptoms before he had been admitted to Wilkes-Barre General Hospital. Hr'g Tr. at 9-10.

6

Dr. Carey operates a family care practice in Noxen, Pennsylvania and is board certified in family medicine. His practice includes patients with pulmonary disease due to occupational exposures. Dr. Carey began treating Mr. Hill when Hill was hospitalized at Wilkes-Barre General, and continued after Hill's transfer to Lakeside. Although Dr. Carey's colleague, Dr. Gwen Galasso, was Hill's primary physician, Dr. Carey assumed responsibility for Hill's care after Hill went to the nursing home. Dr. Carey's testimony was based on his own examinations of Hill, as well as Dr. Galasso's notes and the notes of several other specialists at the hospital and the nursing home. Dep. Tr. at 5-9.

The vast majority of professional observations of Hill, and the conclusions of a variety of physicians who treated him, identified symptoms of pneumoconiosis and the effects of chronic obstructive pulmonary disease ("COPD"). On July 16,

7

2004, the day Hill was admitted to the emergency room at Wilkes-Barre General, Dr. Galasso noted the presence of decreased breath sounds and referenced a chest x-ray that showed bibasilar atelectasis.[1] Eight of the ten physicians who examined Hill during his three-week stay at the hospital made similar observations. For example, when Hill was admitted to the hospital, Dr. David Dalessandro noted scattered rhonchi in Hill's lungs. Four days later, Dr. Patrick Degennaro observed "prominent markings" on the lungs and "abnormal opacities in the bases." App. at 100. Dr. Wenlin Fan confirmed a reduction in lung capacity on a chest x-ray completed on August 2, 2004. Two days later, Dr. Strasser performed a chest x-ray and noted:

---

[1]Atelectasis is the collapse of part or all of a lung. It is caused by a blockage of the air passages (bronchus or bronchioles) or by pressure on the lung. U.S. Nat. Library of Medicine and Nat. Inst. of Health at http://www.nlm.nih.gov/medlineplus/ency/article/000065.htm.

8

"[h]azy density is present in both mid-lung fields." App. at 97. Finally, Dr. Carey testified that upon Hill's arrival at Lakeside on August 5, Hill had decreased breath sounds, some chronic rhonchi, and some coarse rhonchi, all related to a chronic lung disease.[2] Dep. Tr. at 5.

Hill died at 4:15 a.m. on August 7, 2004, two days after being transferred to the nursing home from Wilkes-Barre General. Dr. Carey completed the death certificate and listed the primary cause of death as cardiopulmonary arrest. He also

---

[2] Two physicians, Dr. Sanjeev Garg and Dr. Martin Fried, indicated that Hill's lungs were clear to auscultation on July 17, 2004 and July 28, 2004 respectively. Dr. Decker, another consulting physician, indicated that one of Hill's chest x-rays was free of infiltrate, but he observed decreased breath sounds in the same examination. His notations therefore corroborate that Hill's respiratory system was compromised. Moreover, the notations of these doctors are consistent with observations we have made about pneumoconiosis. We have explained that it is a persistent and progressive disease and although "symptoms may, on occasion, subside, the condition itself does not improve . . . ." *Labelle Processing Co. v. Swarrow*, 72 F.3d 308, 314 (3d Cir. 1995).

noted other contributing causes of death including: renal failure, arteriosclerotic cardiovascular disease and anemia. During his deposition, Dr. Carey explained how Hill's lung disease contributed to his death. Dr. Carey indicated that each of the symptoms listed on Hill's death certificate—respiratory arrest, renal failure, arteriosclerotic cardiovascular disease, anemia—would all be worse because of the lower volumes of oxygen that resulted from Hill's pulmonary disease.

On cross-examination, Dr. Carey further explained that hyponatremia–a deficiency of sodium in the blood–is often seen in people with chronic lung disease. He also confirmed that no medical records were available for Hill for the two days prior to his death on August 7, 2004, after he was transferred to the nursing home. Dr. Carey last saw Hill on August 5, 2004.

In opposing Mrs. Hill's claim, the Director offered a two-page report from Dr. Michael Sherman. His report was

based solely on his review of records he had received from the Department of Labor. Those records included: Hill's death certificate, records from Lakeside Nursing Home, and records provided by the Wyoming Valley Health Care System from Wilkes-Barre General Hospital. The latter included records of Hill's three-week stay at Wilkes-Barre General. Based on his examination of those records, Dr. Sherman stated "[t]here is no note in the record of any shortness of breath, dyspnea, or respiratory distress." App. at 54. He therefore concluded:

> 1.      The cause of death is not clear from the record. Clearly Mr. Hill was in poor condition. He was severely malnourished; an albumin of less than 2.0 is associated with immune compromise and he was thus likely to have difficulty warding off infection. He had new onset of atrial fibrillation and thus may have had underlying coronary artery disease; he was also at risk for developing systemic emboli from the atrial fibrillation. There are no records after 8/5/04, so the circumstances immediately surrounding Mr. Hill's death two days later are not known.

> 2.      However, I find *no evidence* that death was

11

caused by pneumoconiosis or that pneumoconiosis contributed *significantly* to Mr. Hill's death. There is *no evidence* in the record to suggest that Mr. Hill had dyspnea, respiratory distress, or respiratory failure when he arrived at the nursing home. Indeed, he was felt to be stable on the day of admission. Death appears to be related to a general level of severe impairment from dementia and malnutrition, and possibly due to his heart disease. However, I do not find evidence for a contribution from COPD or from pneumoconiosis.

*Id*. (emphasis added).

### III. THE ALJ'S DECISION

In denying Mrs. Hill's claim, the ALJ noted the immediate causes of death listed on the death certificate, which included COPD, but focused on the relative weight he would assign to Dr. Sherman's report as opposed to the deposition testimony of Dr. Carey. The ALJ offered the following explanation for completely dismissing Dr. Carey's testimony:

[Dr. Carey] did not state that pneumoconiosis contributed to or hastened the miner's death. Rather he stated only that the miner's "chronic lung disease" or "chronic obstructive pulmonary disease" contributed to his death.

12

> Indeed, in neither the death certificate nor his testimony did Dr. Carey state that pneumoconiosis or a pulmonary disease related to coal mine employment contributed to or hastened the miner's death.

ALJ's Decision at 5-6.

The ALJ also criticized Dr. Carey for speaking only of how "'[s]omeone with a chronic lung disease or chronic obstructive pulmonary disease' was affected by such a condition." *Id*. at 6 (emphasis in original). The ALJ's concern regarding the implication of Dr. Carey's testimony is evidenced by the ALJ's statement that Dr. Carey's opinion was "tantamount to stating that anyone and everyone who suffers from a chronic lung disease or COPD and dies [could claim that] those conditions are always substantial contributors to or hasteners of death." *Id*. The ALJ, therefore, gave Dr. Carey's opinion no weight.

Rather, the ALJ relied upon Dr. Sherman's conclusion

13

that there was no evidence of pneumoconiosis contributing to Hill's death. The ALJ found the evidence of decreased breath sounds, scattered rhonchi, and bilateral crackles, after Hill's hospital stay and prior to his death, insufficient to support Dr. Carey's conclusion. Finally, the ALJ added that even if Dr. Carey's opinion were entitled to some consideration, it was outweighed by the superior opinion and qualifications of Dr. Sherman. *Id*.

The Board affirmed the ALJ's decision, finding that Dr. Carey did not establish legal or clinical pneumoconiosis and that his medical opinion was properly discredited. BRB Decision at 5. The Board also emphasized Dr. Sherman's determination that the cause of death is unclear due to the absence of records two days prior to Hill's death. *Id*. at 2.

## IV. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review the Board's determination pursuant to 33 U.S.C. § 921(c). The Board is bound by the ALJ's findings of fact if they are supported by substantial

14

evidence. Our review of the Board's decision is limited to a "determination of whether an error of law has been committed and whether the Board has adhered to its scope of review." *Kowalchick v. Director*, *OWCP*, 893 F.2d 615, 619 (3d Cir. 1990)(citations omitted).

In reviewing the Board's decision, we must independently review the record and decide whether the ALJ's findings are rational, consistent with applicable law and supported by substantial evidence on the record considered as a whole. *See Mancia v. Director*, *OWCP*, 130 F.3d 579, 584 (3d Cir.1997) (citing *Kowalchick*, 893 F.2d at 619). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. We exercise plenary review over the ALJ's legal conclusions that were adopted by the Board. *See Soubik v. Director*, *OWCP*, 366 F.3d 226, 233 (3d Cir. 2004)(citations omitted).

## V. DISCUSSION

15

"The Black Lung Benefits Act (Act) provides . . . that benefits are to be provided 'to the surviving dependents of miners whose death was due to [pneumoconiosis.]'" *Lukosevicz v. Director, OWCP*, 888 F.2d 1001, 1003 (3d Cir. 1989) (brackets in original) (citing 30 U.S.C. § 901(a)).[3] However, the Act does not define when a miner's death will be considered "due to" pneumoconiosis. Rather, Congress left that definition to the Secretary of Labor who "redelegated all his powers under the Act to the Director [of the Office of Workers' Compensation Programs]." *Id*.

In *Lukosevicz*, we upheld the Director's determination that a miner's death would be "due to" pneumoconiosis if that disease "actually hastens death [or] is a substantially

---

[3] "Pneumoconiosis, also known as black lung disease or anthracosis, is a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment. 'Pneumoconiosis' includes both clinical and legal pneumoconiosis, which include, but are not limited to anthracosilicosis, anthracosis, anthrosilicosis ..., [and] any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment.'" *Balsavage v. Director, OWCP*, 295 F.3d 390, 393 n.2 (3d Cir. 2002) (citations omitted).

16

contributing cause of death . . . ." *Id*. at 1006.  There, the ALJ

had denied a claim for survivor's benefits because the

immediate cause of death was pancreatic carcinoma.  The ALJ

concluded that even though the death certificate listed

pulmonary emphysema "as an 'other significant condition,'" the

survivor had not satisfied her burden of proving that the miner's

death was "due to," pneumoconiosis. *Id*. at 1003.  The surviving

spouse and the Director both petitioned for review of the ruling

arguing that survivor benefits were appropriate if the miner's

pneumoconiosis hastened his death, even if it was not the direct

cause. *Id*.  We agreed.

We held that the fact that the immediate cause of the

miner's death was pancreatic cancer was irrelevant under 20

C.F.R. § 718.20(c), because the uncontradicted evidence showed

that pneumoconiosis contributed to the miner's death, *"albeit*

*briefly."* *Id*. at 1005 (italics in original).[4]  The miner's treating

_____

[4]  Pursuant to the regulation applicable to Mrs. Hill's claim, death is considered due to pneumoconiosis if any of the following criteria is met:

17

physician had testified that the miner's lungs "show[ed] pulmonary anthracosis . . . [and in the doctor's opinion] *this condition shortened* [the miner's] life." *Lukosevicz*, 888 F.2d at 1004. We held that that was enough to establish that the miner's death was "due to" the underlying pneumoconiosis, and we therefore remanded for immediate payment of benefits.[5] *Id*. at 1006. Hill's case is very similar.

As the Director correctly summarizes in its brief, the ALJ

---

(1) Where competent medical evidence established that the miner's death was due to pneumoconiosis, or
(2) Where pneumoconiosis was a substantially contributing cause or factor leading to the miner's death or where the death was caused by complications of pneumoconiosis, or
(3) Where the presumption [arising from medical evidence of complicated pneumoconiosis] set forth at § 718.304 is applicable.
4) However, survivors are not eligible for benefits where the miner's death was caused by a traumatic injury or a principal cause of death was a medical condition not related to pneumoconiosis, unless the evidence establishes that pneumoconiosis was a substantially contributing cause of death.

20 C.F.R. § 718.205(c).

[5] We actually remanded to the Board with instructions to vacate the order denying benefits and instructed that the Board further remand to the Deputy Commissioner of the Civil Division of Coal Mine Worker's Compensation, Office of Workers' Compensation Programs for immediate payment of benefits. *Lukosevicz*, 888 F.2d at 1004.

18

rejected Dr. Carey's conclusion that Mr. Hill's death was due to pneumoconiosis for two reasons. "[F]irst, the ALJ believed that Dr. Carey "failed to diagnose a coal-mine-employment-related lung disease; and second, he failed to adequately explain how the miner's lung disease contributed to or hastened death." Respondent's Br. at 10 n.6.. Although the Director only defends the second justification now, both of the ALJ's justifications for denying this claim are extremely troubling and perplexing.

### A. Legal and Clinical Definitions of Pneumoconiosis

First, there is absolutely no issue here that Mr. Hill suffered from pneumoconiosis, nor is there any dispute that that condition resulted from his employment in mines. The ALJ's opinion even notes that "[T]he parties stipulated that the miner, Charles W. Hill, had a coal mine employment history of 9 ½ years and that Claimant established that the miner had pneumoconiosis arising out of his coal mine employment." App. at 28. Moreover, Mr. Hill's breathing difficulties and the changes in his respiratory system were documented by the testimony of Mrs. Hill, as well as medical records and the deposition testimony of Dr. Carey as summarized above.

19

For reasons that are neither apparent, nor explainable, the ALJ stressed that Dr. Carey did not specifically state that "pneumoconiosis" contributed to or hastened Hill's death. Instead, Dr. Carey used the terms "chronic lung disease" or "chronic obstructive pulmonary disease." That is a distinction without a difference; it ignores the definition of "pneumoconiosis," codified in the applicable regulations.

As we noted earlier, pneumoconiosis is defined as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 20 C.F.R. § 718.201(a). "The legal definition of pneumoconiosis (i.e. *any* lung disease that is significantly related to, or substantially aggravated by, dust exposure in coal mine employment) is much broader than the medical definition, which only encompasses lung diseases caused by fibrotic reaction of lung tissue to inhaled dust." *Labelle,* 72 F.3d at 312 (emphasis added). The legal definition therefore includes "any chronic restrictive or obstructive pulmonary disease," arising out of coal mine employment. 20 C.F.R. § 718.201(a). Dr. Carey's description of the condition that caused Mr. Hill's death falls

20

squarely within the regulatory definition of pneumoconiosis.[6] Rather than seizing upon a semantic technicality to reject Dr. Carey's explanation of the causes of Hill's death, the ALJ should have recognized that Dr. Carey was stating that "pneumoconiosis," as defined under the Black Lung Benefits Act, was a cause of, and a hastening factor in, his death.

The Board's order affirming the ALJ's decision is equally as puzzling with respect to its treatment of the legal and clinical definitions of pneumoconiosis. The Board stated the following in explaining why Dr. Carey's opinion was properly dismissed by the ALJ:

> Dr. Carey did not make a finding of clinical pneumoconiosis, and as he did not state that his finding of chronic obstructive pulmonary disease/chronic lung disease is related to coal mine employment (legal pneumoconiosis), the administrative law judge properly found the opinion insufficient to establish that the miner's death was due to pneumoconiosis.

---

[6] The legal definition of pneumoconiosis is broad and "includes but is not limited to, coal workers' pneumoconiosis, anthracosilicosis, anthracosis, anthrosilicosis, massive pulmonary fibrosis, progressive massive fibrosis, silicosis or silicotuberculosis, arising out of coal mine employment." *Labelle,* 72 F.3d at 315 (citing 20 C.F.R. § 718.201). In fact, even "[c]hronic bronchitis, as a pulmonary disease, falls within the legal definition of pneumoconiosis." *Id.*

BRB Decision at 5. However, there is absolutely no issue here about whether Hill's pneumoconiosis "is related to coal mine employment." Hill had been receiving benefits under the Black Lung Benefits Act for nearly ten years before he died, and even if he had not received those benefits, the causal relationship between his "coal mine employment" and pneumoconiosis was stipulated to before the ALJ. Dr. Carey may, or may not, have been in a position to render an opinion about the cause of Hill's pneumoconiosis, but it should have been obvious that he did not have to. The issue here is what caused Hill's death, not what caused his pneumoconiosis.

## B. Dr. Carey's Deposition Testimony

We also find the ALJ's decision to assign no probative value to Dr. Carey's opinion because of the doctor's conditional response to a hypothetical question to be severely flawed. The ALJ was particularly dismissive of the following testimony during Dr. Carey's deposition:

> Q.  Well, how are they affected, in what sense, with respect to comparing him to someone who didn't have the lung disease but with all of those problems?

> A.  Someone with a chronic lung disease or chronic obstructive pulmonary disease is going to have

22

lower volumes of oxygen that makes everything work harder. His heart's going to work harder. If this is occupational exposure that has caused this chronic obstructive pulmonary disease it's also going to cause his arteriosclerotic, to an extent, his arteriosclerotic cardiovascular disease. His renal failure, if your kidneys aren't getting enough oxygen, that tends to push towards renal failure.

The ALJ indicated, as cited above, that this "was tantamount to stating that with anyone and everyone who suffers from a chonic lung disease or COPD and dies, those conditions are always substantial contributors to or hasteners of death." App. at 32. However, Dr. Carey was asked by counsel to draw a broader comparison between Hill and a person without any pulmonary disease. His response relies upon the chronic lung disease already stipulated to by both parties and evidenced in chest x-rays. Dr. Carey connected these facts to the symptoms that Hill manifested prior to his death. His statement is not a general characterization; it is directly related to Hill's condition, and responsive to the question he was asked.

Moreover, we have previously cautioned that an expert's testimony with respect to the pulmonary disease of a miner must be examined in light of the all of the testimony offered, rather than simply by way of selective quotes. *See Balsavage*, 295

23

F.3d at 396 ("[S]tatements must be viewed in context–both as responses on cross-examination to general questions and against the backdrop of repeated assertions that pneumoconiosis contributed to the [m]iner's death."); *cf. Mancia*, 130 F.3d at 590 (noting valid use of a hypothetical question and answer in assessing whether a miner's death was caused by underlying lung disease). In *Balsavage*, the ALJ rejected an expert's testimony because of his use of the word "could" when discussing whether pneumoconiosis was a factor in the development of coronary artery disease and atrial fibrillation. 295 F.3d at 396. We rejected such parsing, especially when viewed against the expert's unequivocal testimony about the contributory role of pulmonary disease to his patient's death.

Dr. Carey firmly asserted that the other factors related to Hill's death would not have been as severe, but for the presence of pulmonary disease. Nothing on this record, including the report of Dr. Sherman undermines, Dr. Carey's testimony about the effect a compromised respiratory system has on one's health and resilience. To the extent that Dr. Carey's testimony was at all conditional, the meaning is unmistakable when viewed in context. *See Mancia*, 130 F.3d at 593 ("The ALJ was not free

to selectively credit testimony merely because it supports a particular conclusion while ignoring all evidence contrary to that conclusion.").

More significantly, however, we are at a loss to understand why the ALJ was so troubled by Dr. Carey's testimony about the effect of a compromised respiratory system on the human body. One need not be board certified in pulmonology nor have an advanced degree in anatomy to appreciate the impact that low oxygen levels in the blood can have on the human body. Common sense suggests that if the heart and lungs do not have a sufficient supply of oxygen to function properly, the result could surely include organ failure as well as other complications.

Here, Dr. Sherman's testimony even confirmed that Mr. Hill was malnourished when admitted to the nursing home. It is difficult to conclude that an inadequate oxygen supply in the blood because of a compromised respiratory system would not hasten the demise of any patient in that condition. That is what Dr. Carey said, and that is the natural consequence of the simple biological fact that our bodies need an adequate supply of oxygen for organs to function properly. If there are concerns

that it becomes too easy to establish that a miner's death was "due to" pneumoconiosis given that causation, those concerns must be addressed by amending the Act or the regulations promulgated under it.[7] They can not be addressed by denying claimants like Mrs. Hill benefits they are entitled to when a spouse has pneumoconiosis as a result of working in mines, and that pneumoconiosis hastens his death in some way.

## C. Dr. Sherman's Report

As we have noted, Dr. Sherman's report does not contradict Dr. Carey's testimony about the impact of a compromised respiratory system. Rather, the ALJ interpreted Dr. Sherman as concluding that there was "insufficient [evidence] . . . to support a finding that pneumoconiosis contributed *significantly* to the miner's death." ALJ's Decision at 6. The ALJ's use of the phrase "contributed significantly" causes us to wonder if he was aware of our discussion in *Lukosevicz*. Under our precedent, the law does not condition

---

[7] Statistics suggest that such a concern by the ALJ is unwarranted. Miners and their widows who attempt to claim Black Lung benefits meet with little success. *See* Office of Workers' Compensation Programs, Annual Report to Congress, Fiscal Year 2003, at 23 (noting that the approval rate for initial review of claims for Black Lung benefits is 7.8%).

survivor benefits only upon proof that pneumoconiosis was a significant or substantial contribution to the miner's death; rather, the claimant's burden is also satisfied by proving that the underlying pneumoconiosis hastened the miner's death, even if only slightly. Thus, pneumoconiosis need not be the sole or even primary cause of a miner's death; it need only be a contributing factor.

The ALJ credited Dr. Sherman's report over Dr. Carey's testimony because of Dr. Sherman's purportedly superior credentials and qualifications, as well as the ALJ's belief that Dr. Carey did not qualify as a treating physician under 20 C.F.R. § 718.104. Though both findings are dubious here, Dr. Sherman's opinion must still be supported by adequate evidence. *See e.g.*, *Lango v. Director, OWCP*, 104 F.3d 573, 577 (3d Cir. 1997) ("The mere statement of a conclusion by a physician, without any explanation of the basis for that statement, does not take the place of the required reasoning."); *Kertesz v. Crescent Hills Coal Co.*, 788 F.2d 158, 163 (3d Cir. 1986) (holding that an ALJ should reject any medical opinion that is insufficiently reasoned or reaches a conclusion contrary to objective clinical evidence). Dr. Sherman's report falls short

of that standard, and does not merit the determinative weight that the ALJ gave it.

Despite the uncontradicted evidence of Hill's history of pneumoconiosis and the uncontradicted evidence of respiratory problems he was experiencing just days before his death, Dr. Sherman stated with certainty that "there is *no* evidence of a contribution by COPD or pneumoconiosis." ALJ's Decision at 5 (emphasis added). That statement is simply inconsistent with the medical records, Hill's medical history, and x-rays showing Mr. Hill's compromised pulmonary system. Every physician who examined Hill within a month of his death, and every medical examination and finding, confirmed his pulmonary disease, decreased breath sounds, and respiratory difficulties. Breathing problems, decreased lung sounds and other complications consistent with COPD were documented during Hill's hospitalization immediately preceding his transfer to Lakeside Nursing Home.[8] It is undisputed that a medical

---

[8] We note, as cited in the Director's brief, that Wilkes-Barre General indicated that Hill was discharged in stable condition to Lakeside. App. at 114. However, an indication that a patient is in stable enough condition to be transferred to another facility does not show that his medical problems had somehow reversed course or were resolved entirely.

examination on August 5th disclosed decreased breath sounds and "chronic rhonchi."[9]

It is worth repeating that in *Lukosevicz*, *supra*, we held that the miner's death was "due to" pneumoconiosis even though the actual cause of death was pancreatic cancer rather than pneumoconiosis. We explained that pneumoconiosis need only have some identifiable effect on the miner's ability to live. Despite Dr. Sherman's report, and the ALJ's reliance on it, this record establishes that decreased levels of oxygen in the blood due at least in part to pneumoconiosis, hastened Hill's death.

### D.  **Availability of Records Near Time of Death**

Dr. Sherman, the ALJ and the Board all highlight the absence of any medical records for the two days prior to Hill's death, and use that to support the conclusion that the record is inconclusive as to whether Mr. Hill died due to pneumoconiosis.

_____

[9] "Rhonchi," are defined as "added sound[s] occurring during inspiration or expiration caused by air passing through bronchi that are narrowed by inflammation or the presence of mucus in the lumen" and inhere decreased lung capacity. Stedman's Medical Dictionary 1235 (5th Lawyer's ed. 1982). Other courts have noted that the presence of rhonchi in the lung fields is consistent with findings documenting pneumoconiosis. *See, e.g.*, *Peerless Eagle Coal Co. v. Taylor*, 107 F.3d 867, 867 (4th Cir. 1997); *Freeman United Coal Min. Co. v. Hudson*, 105 F.3d 660, 661 (7th Cir. 1997); *Thorn v. Itmann Coal Co.*, 3 F.3d 713, 715 (4th Cir. 1993).

However, such analysis is inconsistent with the parallel regulatory scheme provided by the Social Security Administration. 20 C.F.R. § 410.462(b) states:

> Where the evidence establishes that a deceased miner suffered from pneumoconiosis or a respirable disease and death may have been due to multiple causes, death will be found due to pneumoconiosis if it is not medically feasible to distinguish which disease caused death or specifically how much each disease contributed to causing death.

Moreover, given the uncontradicted evidence on this record, we can think of nothing that suggests either that some mysterious force intervened or that Mr. Hill's pneumoconiosis underwent a miraculous reversal and his blood oxygen levels returned to normal right before he died. Here, medical records from a mere five days before Hill's death document the complications of his pneumoconiosis. Dr. Sherman's report does not offer a credible theory that would explain how Mr. Hill would have been somehow able to shake off the effect of pneumoconiosis in the two days before he died so that his respiratory arrest, renal failure, arteriosclerotic cardiovascular disease, and anemia were somehow not exacerbated by the respiratory disease that he had suffered from for so many years prior to his death. We are

30

simply unable to imagine anything that could have been revealed by a medical examination during the final 48 hours of Mr. Hill's life that would have undermined the force of Dr. Carey's testimony, or the validity his conclusions, and neither the ALJ nor the Board suggests anything that could have had that effect.

"[C]ourts have long acknowledged that pneumoconiosis is a progressive irreversible disease .. . ." *Labelle*, 72 F.3d at 315. Dr. Sherman's report in no way undermines Dr. Carey's opinion that low oxygen levels in the blood associated with pneumoconiosis or COPD can compromise every system in the body. Yet, both the ALJ and Dr. Sherman were reluctant to conclude that Hill's death was due to pneumoconiosis because no one saw him on August 7, the day he died, or within the two days before he passed away. The implication that such records are mandatory for the receipt of benefits places an unfair and inappropriate burden on any petitioner or claimant.

Regrettably, the result here is more consistent with an attempt to justify denying benefits than with a neutral inquiry into whether the record establishes eligibility for benefits. The ALJ's focus on the time immediately preceding death would raise insurmountable obstacles to an eligible survivor,

conditioning determination of benefits not on a miner's medical history, but on the timing of doctors' visits. The law simply does not require a miner with a respiratory system that has been ravaged by mine-related pneumoconiosis to hang on until a physician can document his last moment of life so that the survivor will be able to document that his impaired respiratory system hastened his death.[10]

## VI. CONCLUSION

For all the reasons set forth above, we hold that the ALJ's denial of Mrs. Hill's request for survivor's benefits under the Black Lung Benefits Act and the Board's subsequent affirmance of that decision are not supported by substantial evidence in the record. In her brief, Mrs. Hill "urges this Court not to remand the matter for further consideration. Given the foregone conclusion, based on the proper analysis of the evidence of record, . . . this Court should issue an Order vacating the denial of benefits and substituting an award of benefits." (Petitioner's

---

[10] Our concern over the denial of benefits here is not mitigated by Dr. Sherman's purportedly "superior credentials." As we noted above, Dr. Sherman does not contest Dr. Carey's assessment of Hill's respiratory problems, only whether Hill's death was due to his pneumoconiosis, and the record raises concerns about whether he understood what is meant by that phrase. *See Balsavage*, 295 F.3d at 397.

Br. at 13.)  In light of the facts presented, we agree.

There is no issue of credibility here, nor is there any dispute that Hill suffered from work related pneumoconiosis or the systemic effect of that progressive disease.  The conflicting inferences introduced by the ALJ are conclusively resolved by correct application of the regulatory scheme, as well as our precedent, leaving only one conclusion possible—that pneumoconiosis hastened Hill's death.  *See Mancia*, 130 F.3d at 579 (citing *Kowalchick*, 893 F.2d at 624).  Given the medical evidence on this record, we believe that Mrs. Hill has established her entitlement to survivor's benefits as a matter of law, and there is nothing left to do but award the benefits she is clearly entitled to.

Accordingly, we will "grant the petition for review, reverse the decision of the Board and remand for the limited purpose of awarding survivor's benefits in accordance with 20 C.F.R. § 725.503(c).  We urge the Board to expedite this award so that survivor's benefits will begin as soon as possible." *Mancia*, 130 F.3d at 594.  "[F]urther administrative review is unwarranted." *Sulyma v. Director, OWCP*, 827 F.2d 922, 924 (3d Cir. 1987).